## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DRASHEA STEVENSON,

      Plaintiff,

v.                                  Case No: 8:19-cv-1462-CEH-JSS

FRONTIER FLORIDA, LLC,

      Defendant.

_____/

## O R D E R

In this employment discrimination action, Plaintiff Drashea Stevenson ("Plaintiff" or "Stevenson") sues his former employer Defendant Frontier Florida, LLC ("Defendant" or "Florida") for alleged sexual discrimination under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), Florida's Civil Rights Act of 1992 ("FCRA"), and the City of Tampa's Human Rights Ordinance ("THRO"), and for retaliation in violation of Florida's Whistle Blower Act, Fla. Stat. § 448.101, *et seq.* Doc. 1. This matter is before the Court on Defendant Frontier's Motion for Summary Judgment (Doc. 36), Plaintiff Stevenson's response in opposition (Doc. 43), Frontier's reply (Doc. 44), and the parties' Joint Stipulation of Agreed Material Facts (Doc. 42). Upon due consideration of the parties' submissions, including deposition transcripts, declarations, legal memoranda and accompanying exhibits, and for the reasons that follow, Defendant's Motion for Summary Judgment (Doc. 36) will be granted.

I.     BACKGROUND[1]

A.     Undisputed Facts[2]

As part of a 2016 acquisition of another communications company, Frontier became the employer of the existing employees of that company, including Melanie Williams ("Williams"), Plaintiff Stevenson, Rhonda Britto ("Britto"), Joe Torch ("Torch") and George Vernon Burrell, Jr. ("Burrell"). Doc. 42 ¶ 1. Frontier continued the same general operations of the predecessor company, providing cable, internet and other wired and wireless services to commercial and residential customers. Doc. 37-3 ¶ 2.

Stevenson began his career with the predecessor company in 2002 as a field foreman managing installation and maintenance for cable and internet services until he was transferred to call dispatch in 2004. Doc. 42 ¶ 2. From approximately 2006 to 2008, Stevenson was employed in construction, overseeing cable maintenance for all Florida facilities. *Id.* Stevenson's next position was files installation and maintenance supervisor for fiber optic cable. *Id.* Stevenson was promoted to Area Manager for certain territories within Florida including supervision of largely copper cable

_____

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations, depositions, and exhibits, as well as the parties' Stipulation of Agreed Material Facts (Doc. 42). For purposes of summary judgment, the Court presents the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

[2] These facts are taken primarily from the parties' Stipulation of Agreed Material Facts (Doc. 42), and the Declaration of Melanie Williams (Doc. 37-3), unless otherwise indicated.

installation and repair. *Id.* In 2015, Stevenson was promoted to Area Manager for all business cable installation for Florida. *Id.*

In 2016, at the time the Frontier acquisition was announced, Stevenson was responsible for all business conversions to Frontier's technology in Florida in anticipation of the takeover. *Id.* As a result of Stevenson's work experience, he was knowledgeable about both fiber and copper cable installation and repair including identifying the difference between a splice and a full replacement of a cable. *Id.* ¶ 3. On March 1, 2017, Stevenson moved to a service-side director position, overseeing all non-construction activities, including repair and maintenance of all cable in his territory. Doc. 41-1 at 84; Doc. 37-3 ¶ 8.

Britto began her career with a Frontier predecessor in 1988 in a call center. Doc. 42 ¶ 4. She earned a promotion to Call Center Manager and moved to Florida for that position in 2003. *Id.* She has since held the positions of Marketing Manager, Regional Sales Manager, Alternate Channel Regional Manager, and Area Manager, which is the position she held when Frontier acquired her former employer in 2016. *Id.* As Area Manager, Britto's territory used almost exclusively fiber-optic (as opposed to copper) cable. *Id.* In mid to late 2016, Britto became a service-side director in an area with largely copper cable operations. Doc. 37-3 ¶ 9; Doc. 41-5 at 13.[3]

Williams is responsible for overseeing Frontier's Florida operations. Doc. 42 ¶ 5. Frontier's Operations division oversees the installation and operation of copper and

---

[3] Williams believed that Britto moved into this new role in December 2016. Doc. 37-3 ¶ 9.

fiber optic cable run which allows provision of internet and other services to commercial and residential customers. *Id.*

In Florida, Frontier employed four directors, all of whom report directly to Williams. *Id.* ¶ 6. In December 2016, Frontier employed the following individuals as Directors: Stevenson (male), Britto (female), Geno Flori (male), and Douglas Spurlin (male). Local Manager Torch (male) reported to Britto, and Local Manager Burrell (male) reported to Stevenson. *Id.* ¶ 8.  Kyle Perkins ("Perkins") (male), who was a "cable splicer" at the time, reported to Burrell and was subordinate to Stevenson. *Id.* ¶ 9.

On May 2, 2017, Perkins sent Williams an email alleging he had evidence that a vendor was overbilling Frontier for work that was not performed. *Id.* ¶ 10. This was the first notice that Williams received from anyone at Frontier regarding the vendor overbilling. Doc. 37-3 ¶ 11. Williams scheduled a conference call (which occurred on May 18, 2017) with herself, Perkins, Danny Alfonso (Union Representative on behalf of Perkins), Steve Snedegar (AVP HR) ("Snedegar"), and Joe Starsick (Associate General Counsel) to address the fraudulent billing raised by Perkins. *Id.* ¶ 14; Doc. 42 ¶ 11. During the call, a discussion was held regarding the concern of Perkins that a vendor may be billing Frontier for cable replacement instead of cable repair or performing cable replacement when only cable repair was needed. Doc. 37-3 ¶ 14. Perkins expressed concern that the problem was widespread and expressed frustration for having brought this to the attention of his direct (Burrell) and next-level (Stevenson) managers and Torch and Britto, although nothing had been done. *Id.* Following the

call, because it was clear to her that Perkins had evidence suggesting significant revenue loss to Frontier, Williams referred the matter to Frontier's Security division for an investigation into the irregularities Perkins had identified. Doc. 37-3 ¶ 15; Doc. 42 ¶ 12.

On May 19, 2017, Anna Hubbartt ("Hubbartt"), Security Manager, began investigating the alleged improper billing. Doc. 42 ¶ 13. The Security investigation focused on detecting any potential collusion between Frontier employees and the vendor at issue and quantifying the alleged overbilling. *Id.* ¶ 14. Perkins, Stevenson, Britto, Torch, and Burrell were interviewed as part of the Security investigation. *Id.* ¶ 15. Williams participated in interviews of Stevenson and Britto. Doc. 37-3 ¶ 18.

In the Security investigation, Stevenson told Hubbartt he was confident he could identify an improper vendor bill because of his prior experience as a technician, Local Manager, Area Manager and Director. Doc. 42 ¶ 16. In the Security investigation, Britto stated she recalled Stevenson consulted, via telephone, with Carlos Bates, Frontier's administrator for the vendor contract at issue, about the examples presented to them by Perkins. *Id.* ¶ 17.

The Security investigation concluded that by late February 2017, Perkins had notified his supervisor, Burrell, of the proof and of his concern about one of Frontier's vendors intentionally overbilling Frontier on two jobs. Doc. 37-3 ¶ 20. The Security investigation also concluded that Burrell, in turn, alerted his supervisor, Stevenson, about the problem and Stevenson met with Burrell and Perkins after a town hall meeting. *Id.* ¶ 21. According to Williams, the Security investigation reflected that

5

Stevenson agreed to set up a meeting to gather more information or further investigate the extent of the billing issue, but never did. *Id.* ¶ 22. Thereafter, Perkins contacted Britto about the same concerns, and she scheduled a meeting on March 3, 2017, to discuss the vendor billing concerns. *Id.* ¶ 23. Williams was under the impression that Britto requested Torch, Burrell, and Stevenson to attend the meeting because Britto did not feel she was seasoned enough in the construction work, particularly with copper cable, to appreciate the concerns of Perkins. *Id.* ¶ 24. In Williams' mind, this evidenced Britto's willingness to seek help understanding whether this was a matter that she needed to act upon. *Id.*

The investigation revealed that Perkins presented evidence at the March 3rd meeting of the fraudulent billing, and he suggested someone should audit other invoices for similar misconduct. *Id.* ¶ 25. It was Williams' understanding that by the end of the meeting, Stevenson minimized the potential problem raised by Perkins as a "business as usual" discrepancy." *Id.* ¶ 26. Stevenson did not dispute this characterization in his interview, but instead it was corroborated by his continued attempts to minimize the issue and claim that Perkins had not provided enough evidence of the over-billing. *Id.* Williams had the impression that Britto relied upon Stevenson's assessment that Perkins had not presented anything more than "business as usual" inconsistencies. *Id.* None of the managers took any further action regarding Perkins' concerns following the meeting. *Id.* ¶ 27. The HR investigation concluded that Torch and Burrell did not take any further action following the March 3rd meeting

because they believed Stevenson and/or Britto, as directors, would take further action. *Id*. ¶ 28.

Ultimately, Hubbartt found the vendor at issue had been improperly billing Frontier for its services for months and the improper billing had occurred in multiple territories overseen by multiple Directors. Doc. 42 ¶ 18. Hubbartt also concluded half of the invoices contained sufficient evidence on their face to prove the fraudulent billing, which meant the invoice approvers should have caught the billing errors solely upon review of the invoices. *Id.* The vendor had overbilled Frontier by about $152,000. *Id.* The Security investigation found no evidence of collusion or kickbacks between the vendor and any Frontier employees. *Id.*

The HR investigation concluded that Britto, who was only two months into her new role, did not have the experience or knowledge in copper to understand the scope of the issue or the need to escalate the matter to higher management, but that she did little to educate herself as to the potential problem and instead relied on Stevenson's assessment that it was a "business as usual" discrepancy. Doc. 37-3 ¶ 29. The HR investigation further concluded that Stevenson had the experience and knowledge to understand the potential scope of the problem due to his prior experience, and he should have escalated the situation of potential fraud to higher management. *Id*. ¶ 30. Snedegar believed that Stevenson continued to deny he should have taken further action and he failed to take responsibility for his inaction, whereas Britto acknowledged her error and demonstrated a willingness to learn from the situation. *Id.*

¶ 30. Williams perceived and appreciated this distinction in the behavior and demeanor of the two when she observed their interviews. *Id.*

Snedegar began his HR investigation with a thorough review of what Hubbartt provided. Doc. 42 ¶ 19. Snedegar then determined what other information he needed to determine whether any personnel actions were warranted. *Id.* Over the course of his investigation, Snedegar interviewed Stevenson and Britto. *Id.* ¶ 20. Snedegar recommended Britto receive an in-person coaching and strongly worded documentation. *Id.* ¶ 21. Snedegar recommended Stevenson be demoted. *Id.* ¶ 22.

Williams agreed with HR's assessment that both Stevenson and Britto demonstrated lapses in judgment and that Stevenson's lapse was more serious than Britto's. Doc. 37-3 ¶ 32. In determining what discipline to issue as a result of the determinations of improper conduct, Williams relied on the findings of both the security and HR investigations, as well as her own knowledge and determinations regarding the adequacy of each person's explanations for their actions and inactions given their individual role, knowledge, skills, experience, and opportunities to act. *Id.* ¶ 33. Williams states she did not consider sex when making her decisions regarding the discipline to be assessed against the respective employees. *Id.* ¶ 34. Williams determined independently the appropriate personnel action to be taken as to each individual. *Id.*

Williams was most concerned about the lapses in judgment of the directors, particularly their failure to escalate the issue to her upon their learning of the vendor billing issue from Perkins. *Id.* ¶ 35. Given the level of responsibility Directors have to

8

run operations in Florida, Williams stated she must be able to rely upon their judgment to protect the interests of Frontier. *Id.*

In reviewing the interviews of Stevenson and Britto and given Stevenson's continued failure to act, despite his admission that he understood the magnitude of Perkins' concerns and his having the experience to appreciate and identify the problem, Williams concluded she could no longer rely on Stevenson. *Id.* ¶ 36. In Williams' view, Stevenson was unwilling to accept responsibility for his failure to appropriately escalate the issue when he should have. *Id.* ¶ 37. Williams viewed Stevenson's failure to recognize his mistakes and be accountable for his actions as evidence of a serious lack in judgment warranting termination. *Id.*

Regarding discipline of Britto, Williams recognized Britto was in a different situation than Stevenson given that she was new to the role and her lack of significant prior experience. *Id.* ¶ 38. While Williams still found that Britto suffered from a lapse in judgment in failing to escalate the issue, the fact that Britto owned up to her mistakes and was willing to learn from them distinguished her conduct from Stevenson's *Id.* Williams also credited Britto with setting up the March 3, 2017 meeting and recognized that she was relying on Stevenson's assessment of the situation because of his superior experience, particularly with copper cable. *Id.*

On August 29, 2017, Williams, with approval of her supervisor Christopher Levendos, decided Torch and Burrell would receive coaching and documentation, Britto would receive a serious coaching and documentation, and Stevenson would be terminated. Doc. 42 ¶ 23.

9

On September 20, 2017, Williams, with Snedegar in attendance, met with Stevenson in Williams' office to notify Stevenson of his termination and to provide him with a copy of his termination letter. *Id.* ¶ 24.

Stevenson admits he never complained about discrimination or illegal action while he was employed with Frontier. *Id.* ¶ 25. Following his termination, Stevenson contacted the Equal Employment Opportunity Commission ("EEOC") to complain of alleged sex discrimination in connection with his termination. *Id.* ¶ 26. Prior to his termination, Stevenson had never been formally disciplined by the Defendant. *Id.* ¶ 27.

After Stevenson's termination, Williams was searching for replacements for two director positions –Plaintiff's and Geno Flori's ("Flori") positions. Williams hired William Nastasiak, a male, to fill Plaintiff's former position and Dennis Coyle, also a male, to fill Flori's position. Doc. 37-3 ¶ 45.

### B.    Plaintiff's Proffer of Evidence of Frontier's Intent to Advance Women

On December 7, 2016, a Frontier Press Release announces its membership in the Paradigm[SM] for Parity coalition and Frontier's commitment to achieve gender parity through its corporate leadership by 2030. Doc. 41-7.

In Williams' profile as a board member for the Hillsborough Area Regional Transit Authority ("HART"), it notes that she is dedicated to "celebrating the women who guided and mentored her by paying it forward to the next generation of women leaders." Doc. 41-10.

### C.    Procedural History

In June 2019, Stevenson filed a four-count Complaint against Frontier alleging a federal discrimination claim under Title VII and state law claims under Florida's Civil Rights Act, Tampa's Human Rights Ordinance, and Florida's Whistle Blower Act. Doc. 1. The Court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Before the Court is Frontier's motion for final summary judgment against Stevenson on all claims. Doc. 36. Frontier also asserts that even if Stevenson has put forth enough evidence for a jury to find his sex was a motivating factor in Stevenson's termination, Frontier has nevertheless proven its third affirmative defense that it would have made the same decision regardless of Plaintiff's sex.  In support, Frontier submits several documents: excerpts of Plaintiff's deposition (Doc. 37-1); declaration of Steven Snedegar, Frontier's Associate Vice President Human Resources (Doc. 37-2); and declaration of Melanie Williams, Frontier's Senior Vice President Operations (Doc. 37-3).

Stevenson opposes the motion, arguing the facts and circumstances surrounding his termination constitute a convincing mosaic of discriminatory intent and that Frontier cannot meet its burden of proving the same decision defense.[4] Doc. 43. In opposition to the motion, Stevenson files the following depositions: Plaintiff's (Doc. 41-1); Snedegar (Doc. 41-2), Perkins (Doc. 41-3), Burrell (Doc. 41-4), and Britto (Doc. 41-5). Plaintiff also files Defendant's Rule 26 disclosures (Doc. 41-6), Frontier's

---

[4] Stevenson's memorandum in opposition does not respond to Frontier's motion directed to his whistleblower claim

December 7, 2016 press release (Doc. 41-7), Frontier's September 6, 2017 press release (Doc. 41-8); Frontier presentation at conference on September 12, 2017 (Doc. 41-9); Melanie Williams' profile as Board Member of the Hillsborough Area Transit Authority (Doc. 41-10); Snedegar email (Doc. 41-11); and Snedegar email with timeline and annotated chart (Doc. 41-12). Frontier replied (Doc. 44) to Stevenson's opposition and filed email communications between Snedegar and Williams (Docs. 45-1, 45-2, 45-3). The parties filed a Stipulation of Agreed Material Facts. Doc. 42. The motion for summary judgment is ripe for the Court's consideration.

## II.   LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence

present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).

## III.   DISCUSSION

Stevenson sues his former employer Frontier for violations of Title VII, the FCRA, and the THRO, alleging he was discriminated against based on his sex—male. Additionally, Stevenson sues for retaliation under Florida's Whistle Blower Act. Frontier moves for summary judgment in its favor on all claims because no disputed issue of fact exists that Frontier did not discriminate against Stevenson when it terminated him. In support of its motion, Frontier submits that Stevenson was terminated because of a serious lapse in judgment as evidenced by his failure to recognize fraudulent billing by a Frontier vendor, failure to recognize the significance of the reported billing issue, and failure to take meaningful steps to act on the reported billing fraud. Stevenson responds that summary judgment must be denied because he can establish that his sex was, at least in part, a motivating factor in Frontier's decision to terminate his employment.

Frontier additionally moves for summary judgment on Stevenson's whistleblower claim, arguing that Stevenson offers no evidence that Frontier retaliated

against him for his post-termination conduct of filing a Charge of Discrimination with the EEOC. Because Stevenson never opposed this argument in his response, Frontier submits that Stevenson has waived his whistleblower claim and Frontier is entitled to summary judgment on the claim. For the reasons that follow, the motion is due to be granted and Frontier is entitled to summary judgment on all claims.

### A.      Sex Discrimination Claims under Title VII, the FCRA, and the THRO

Stevenson asserts claims for discrimination on the basis of his sex (male) under Title VII (Count I), the FCRA (Count II), and the THRO (Count III). The factual predicate for each of the Counts is the same. *See* Doc. 1 at 5–8. "Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII." *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998) (citing *Ranger Ins. Co. v. Bal Harbour Club, Inc.*, 549 So.2d 1005, 1009 (Fla. 1989)). Similarly, the THRO embodies the policies and purpose of Title VII in that it "secure[s] for all individuals within the city the freedom from discrimination because of race, color, religion, national origin, sex, sexual orientation, gender identity or expression, age, handicap, familial status or marital status, in connection with employment, and thereby to promote the interests, rights and privileges of individuals within the city." Tampa Code, § 12-16. Indeed, the THRO's general purpose is to execute policies consistent with the Federal Civil Rights Act of 1964, as amended. *See id.* Accordingly, Frontier contends that the sex discrimination claims under Title VII, the FCRA, and the THRO are to be analyzed under the same legal framework. The Court agrees.

14

### 1.    *Prima Facie* **Case of Sex Discrimination**

"Title VII prohibits employment discrimination on the basis of sex." *Holland v. Gee*, 677 F.3d 1047, 1054 (11th Cir. 2012) (citing 42 U.S.C. § 2000e–2(a)). To prove discrimination based on sex, a Title VII plaintiff may rely on direct evidence, circumstantial evidence, or statistical proof. *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). Stevenson offers no statistical evidence to support his claim. Nor does he argue any comments or remarks made to him rise to the level of direct discrimination. Lacking direct evidence, Stevenson must prove his discrimination claim circumstantially.

In his Complaint, Stevenson asserts that he was treated differently than Britto, a female, who he alleges is a similarly situated individual outside his protected class. In his opposition to the motion for summary judgment, Stevenson argues the material facts form a convincing mosaic of discriminatory intent. Although courts will refer to these arguments as mixed-motive and single-motive "claims," the Eleventh Circuit has explained that "[m]ixed-motive and single-motive discrimination are different theories of discrimination, as opposed to distinct causes of action. Specifically, they serve as alternative causation standards for proving discrimination." *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 n.4 (11th Cir. 2016). Because his response references both single-motive and mixed-motive theories, the Court will address each theory in turn below.

a.  *Single Motive*

In the Eleventh Circuit, courts evaluate such claims using the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and their progeny. Under the framework, Plaintiff must first establish a *prima facie* case of discrimination. *Id.* If a *prima facie* case is established, the burden then shifts to the employer to rebut the resulting presumption of discrimination by producing evidence that it acted for a legitimate non-discriminatory reason. *McDonnell Douglas*, 411 U.S. at 802. The employer does not need to persuade the court that it was actually motivated by the proffered reason, but rather, it need only present evidence raising a genuine issue of fact as to whether it discriminated against the plaintiff. *Burdine*, 450 U.S. at 254. The burden then shifts back to the plaintiff to show that the employer's proffered reason was not its true reason, and instead was a pretext for discrimination. *Id.* at 256.

To establish a *prima facie* case of sex discrimination based on a single-motive theory, Stevenson must show: (1) he was a member of a protected class; (2) he was qualified for the job; (3) he suffered an adverse employment action; and (4) he was treated different than or replaced with someone outside of the protected class. *See, e.g., Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995); *Taylor v. Hudson Pulp & Paper Corp.*, 788 F.2d 1455,1459 (11th Cir. 1986). At issue is the fourth element of the analysis. Frontier argues that Stevenson is unable to meet his burden

16

because he has not identified a similarly situated employee outside his protected class who was treated more favorably and because he was replaced by a male employee. Thus, he fails under the fourth prong.

To the extent Stevenson seeks to establish the fourth prong by claiming Britto was treated more favorably than he was, he would have to establish, at the *prima facie* stage of *McDonnell Douglas's* burden-shifting framework, that Britto is similarly situated. The proper test for evaluating comparator evidence is that a plaintiff must show he and his proffered comparators were "similarly situated in all material respects." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1218 (11th Cir. 2019). The Eleventh Circuit has identified certain guideposts in making the comparison.

> [A] similarly situated comparator–
>
> • will have engaged in the same basic conduct (or misconduct) as the plaintiff . . . ;
> • will have been subject to the same employment policy, guideline, or rule as the plaintiff . . . ;
> • will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff . . . ; and
> • will share the plaintiff's employment or disciplinary history. . . .

*Lewis*, 918 F.3d at 1227–28 (citations omitted). Stevenson and Britto were both Directors under the supervision of Williams. Both approved fraudulent vendor invoices,[5] had been made aware of the issue months earlier, and had not brought the matter to the attention of Williams. But the undisputed evidence shows that Williams,

---

[5] Stevenson contends that the record evidence shows that Britto approved the subject invoices, not him. Doc. 43 at 5. Snedegar's affidavit reflects that improper billing occurred in multiple territories overseen by multiple directors. Doc. 37-2 ¶ 13.

in making her decisions regarding the appropriate punishment for Stevenson and Britto, focused not on the approval of the vendor invoices, but rather on the Directors' actions taken in response to the incident and conduct going forward. *See* Doc. 37-3 §§ 17, 24, 26, 29, 30.

Considering Stevenson and Britto's response to the vendor billing situation, Williams no longer felt confident in Stevenson's ability to make reliable decisions that are in the best interest of Frontier. Specifically, as attested by Williams, the investigation revealed that Stevenson failed to escalate and appreciate the gravity of the vendor's conduct, minimizing Perkins's concerns as typical "business as usual" discrepancies. Doc. 37-3 ¶ 26. Stevenson continued to deny he had any reason to act differently and concluded Perkins did not present enough evidence for Stevenson to determine whether the vendor was improperly billing notwithstanding that he had the experience and knowledge to understand the potential scope of the issue. *Id.* Britto, on the other hand, took action by scheduling the March 3rd meeting and relied on Stevenson's assessment as he had more experience. *Id.* ¶ 29. Additionally, as part of the investigation, Britto admitted she should have escalated the billing issue to higher management, expressed a willingness to learn from the situation, and she was determined to do better in the future. *Id.* ¶ 30.

Stevenson disputes that Britto scheduled the March 3, 2017, meeting. He further responds that he attended the March 3 meeting, during which he contacted a liaison to the vendor. Additionally, he claims he conducted training, including creating a PowerPoint for the training meetings, with his team about the proper review and

18

scrutiny of vendor invoices. Even accepting these facts in a light favorable to Stevenson, Williams, the decision maker, believed Britto was the one who scheduled the meeting, and significantly, Williams found Stevenson exercised poor judgment in not escalating the situation to higher management when Perkins alerted him of the suspected fraudulent billing. Thus, regardless of whether he communicated with the vendor or engaged in further training of his team, he failed to alert higher management of the potential fraud. Even if Williams' belief was incorrect about who scheduled the meeting, there is no evidence that her analysis of the situation or her decision to terminate Stevenson was based on any discriminatory animus due to Stevenson's sex.

It is undisputed that Britto had less experience with copper cable repairs, having only been in her new role for two months, whereas Stevenson was knowledgeable about both fiber and copper cable installation and repair, including identifying the difference between a splice and a full replacement of a cable.[6] Doc. 42 ¶¶ 3, 4. Thus, their relevant employment history differed, further supporting that Britto was not similarly situated. On the undisputed material facts and in a light most favorable to Stevenson, Britto was not a similarly situated comparator because her conduct in response to the billing issue differed from Stevenson and her relevant employment experience differed as well. Therefore, in the absence of a comparator—he was

---

[6] The issue of fraud in the vendor invoices involved a vendor billing Frontier for cable replacement instead of cable repair and/or that the vendor was in fact replacing cable when only a repair was needed. Doc. 37-2 ¶ 6. If a vendor replaces a cable when only a repair is needed, this results in the charges being ten times more than they should be. *Id.*

replaced by a male, not a female, and Britto was not similarly situated—Stevenson is unable to establish a *prima facie* case of discrimination based on his sex.

Even if Stevenson could satisfy the elements of a *prima facie* claim, however, the burden would then shift to Frontier to provide a legitimate, nondiscriminatory reason for its action. *Burke-Fowler v. Orange Cty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006). If this burden is met, Stevenson must then prove that Frontier's stated reasons are a pretext for unlawful discrimination. *Id.* Here, Frontier has proffered a legitimate non-discriminatory reason for Stevenson's termination, specifically Stevenson's poor decision-making. The Eleventh Circuit has recognized that an employee's poor job performance constitutes a legitimate reason for termination. *See, e.g., Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1276 (11th Cir. 2012) (employee could be terminated for legitimate reasons, such as poor performance or dishonesty). Moreover, an employer may terminate an employee for a good reason, a bad reason or no reason at all, as long as it is not for an illegal reason. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law."). Courts "are not in the business of adjudging whether employment decisions are prudent or fair." *Id.* Thus, even if Stevenson could establish a *prima facie* case of discrimination, which the Court has not found, Frontier has stated a legitimate, nondiscriminatory reason for its actions.

The record evidence showed Stevenson had superior knowledge identifying the difference between a splice and a full replacement of a cable. Doc. 42 ¶ 3; Doc. 37-3

¶¶ 8, 9, 24, 29.  Despite Perkins showing him evidence of what appeared to be spliced instead of replaced cable for which replacement was charged, Stevenson did not escalate the issue to management. Doc. 37-3 ¶¶ 25, 26; Doc. 37-2 ¶ 10. In so doing, he minimized the significance of the issue with Perkins and took the position there was not enough evidence to prove fraud in the billing, except perhaps on one invoice. Doc. 37-2 ¶ 10. And rather than acting on the improperly billed invoice, Stevenson told Hubbartt that he believed Burrell followed up on it with the vendor. *Id.* Even given that one invoice, he did not escalate the issue to his manager. *Id.* Further, in the investigation, Stevenson failed to acknowledge or accept how he could have better handled the situation. Doc. 37-3 ¶ 37. Given Stevenson's conduct, Williams lost confidence in his ability to protect the company's interests in the future. Doc. 37-3 ¶ 32.

"[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir.1993) (citation omitted). A reason is not pretext for discrimination "unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). Taking the facts in a light most favorable to Stevenson, nothing about these facts suggests that Stevenson's termination was a pretext for sex discrimination.

b.    *Mixed Motive*

To overcome summary judgment, Stevenson relies on cases that recognize the presentation of a "convincing mosaic" of circumstantial evidence that raises a reasonable inference that Frontier discriminated against him. Doc. 43 at 3 (citing *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019)) In *Lewis*, the Eleventh Circuit held that "[a] 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual. *Id.* (citations omitted). The *Lewis* court found that a mosaic of circumstantial evidence may be used to raise a genuine issue of material fact. *Id.*

Stevenson submits that in April 2016 Frontier was in a financially troubled position and an investigation revealed that one of Frontier's vendors overbilled it by $152,000. Stevenson argues that someone had to be held accountable and thus one of the two managers had to be fired to make a point. Stevenson theorizes that Frontier chose the male—him—over Britto, a female, because of "optics." In his mind, it looked better to fire a man versus a woman.  The facts he offers to back this theory are speculative at best.

The evidence Stevenson offers as creating a "convincing mosaic" is Frontier's membership in the Paradigm[SM] for Parity coalition and the company's commitment to achieving gender parity throughout Frontier's corporate structure by 2030. To

suggest that a policy that promotes gender equality is discriminatory is unpersuasive.[7] Additionally, he relies on Williams' statements in her HART profile in which she references paying it forward to the next generation of women leaders. Stevenson offers no evidence of a connection between Williams' HART profile statement and her decision to terminate him. "Regardless of whether a Title VII plaintiff invokes *McDonnell Douglas* or presents a convincing mosaic of circumstantial evidence, the record must permit the inference of a 'causal link' between the 'discriminatory animus' and the 'discharge or other significant change in the terms or conditions of employment.'" *Lewis*, 934 F.3d at 1196 (Tjoflat, J., *concurring in part*) (citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999) (per curiam)). As a preliminary matter, these statements do not demonstrate a discriminatory animus by Williams or Frontier, and even if they did, there is no evidence on the record before the Court as to a causal link between the statements and the decision to terminate Stevenson.

In his response, Stevenson references other material facts he submits form a convincing mosaic of discriminatory intent, including Human Resources Vice President Angela Christian's question to Snedegar as to whether Britto was qualified for her position if she was not as knowledgeable in this area and Snedegar's recommendation to Williams that Stevenson be demoted as termination would be too severe given Stevenson's time with the company. Stevenson suggests discriminatory

---

[7] Plaintiff does acknowledge that "supporting the professional advancement of other women is admirable and not problematic in and of itself." Doc. 43 at 10.

animus in Williams' decision not to follow Snedegar's suggestion to demote Stevenson as opposed to fire him. However, as Frontier points out, Stevenson never even deposed Williams to ask the reasons for her departure from Snedegar's recommendations. Doc. 44 at 5 n. 5. Thus, Stevenson's speculation that Williams' decision to terminate, rather than demote, him was for a discriminatory basis is not supported by any record evidence.

In contrast, Frontier provides the unrefuted declaration of Williams who explains the reasons Stevenson was terminated. Doc. 37-3. Williams attests that Stevenson was terminated due to his continued excuses for failing to act despite admitting he understood Perkins' concerns of the fraudulent billing issue and despite his experience that allows him to identify such problems. Doc. 37-3 ¶ 36. Stevenson continued to claim he did all that he could do and that no further action was required, and yet he never appropriately escalated the issue to management, never took responsibility for his mistakes, nor was he accountable for his actions or inaction. *Id.* ¶ 37.  In light of these failures, Williams believed she could no longer rely on Stevenson's judgment. *Id.* ¶ 36. Based upon the investigation conducted by H.R., Williams did not perceive Britto to be in the same situation as Stevenson because Britto was new to her role and did not have the significant prior experience with copper cables that Stevenson did. Doc. 37-3 ¶ 38. Williams credited Britto with setting up the March 3, 2017, meeting after Perkins raised the billing issue with her. *Id.* During the investigation, Britto acknowledged her failure to appropriately escalate the issue to management and was willing to learn from her mistakes. *Id.*  Thus, despite Britto's

lapse in judgment, Williams believed Britto accepted responsibility for her failure to act and was willing to learn from the situation to prevent such mistakes from happening again. *Id.*

In a light favorable to Stevenson, even if Williams' beliefs were incorrect, the evidence fails to support that her decision to terminate Stevenson was based on any discriminatory intent. But even if the facts could create an inference of discriminatory intent, Stevenson fails to argue systematically better treatment of similarly situated employees. And, neither Britto nor the male employee hired to replace Stevenson are similarly situated. Moreover, as discussed above, Stevenson cannot establish Frontier's reason for terminating him—due to his poor business judgment—was pretextual. Accordingly, Stevenson's mixed-motive theory of discrimination fails, and Frontier is entitled to summary judgment on Stevenson's discrimination claims.

### B.    Florida's Whistle Blower Act

In Count IV, Stevenson sues Frontier for violating Florida's Whistle Blower Act ("FWA"), by giving a negative review about Stevenson to a prospective employer in retaliation for Stevenson filing a Charge of Discrimination with the EEOC. Doc. 1 at 9–10. Under Florida Statute § 448.102(2), an employer may not take retaliatory personnel action against an employee because the employee "[p]rovided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer." Whistleblower claims under this statute are analyzed

by courts under the same framework used in Title VII retaliation claims. *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945 (11th Cir. 2000).

Frontier argues it is entitled to summary judgment on Plaintiff's whistleblower claim because Stevenson cannot establish a *prima facie* case under the FWA. In its reply, Frontier further argues Stevenson has abandoned this claim as he wholly failed to respond to Frontier's motion directed to the whistleblower count. In general, arguments not developed on summary judgment are waived. *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments[.]" (citation omitted)). Notwithstanding Stevenson's lack of response, the Court will address the merits of the claim.

Here, it is undisputed that no direct evidence of sexual discrimination exists. To establish a *prima facie* whistleblower case in the absence of direct evidence of retaliatory intent, a plaintiff must show: (1) there was a statutorily protected participation; (2) an adverse employment action occurred, and (3) a causal link exists between the participation and the adverse employment action.[8] *Olmsted v. Taco Bell Corp.*. 141 F.3d 1457, 1460 (11th Cir. 1998). As a preliminary matter, Stevenson did not complain to

---

[8] Once a *prima facie* case is established, the employer may proffer legitimate, non-retaliatory reasons for the adverse employment actions. If the employer carries this burden, the plaintiff must then come forward with evidence sufficient to create a genuine issue of fact that each of the proffered reasons are merely pretext for unlawful retaliation. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). Stevenson fails to establish a *prima facie* case and thus the burden never shifts back to Frontier on this claim.

Frontier or the EEOC before his termination. Doc. 41-1 at 151. Thus, he cannot claim his termination was caused by his statutorily protected activity of filing a Charge of Discrimination.

As for the second element, Stevenson alleges that Frontier gave his prospective employer a negative review. On the facts of this case, it is doubtful that a negative review would qualify as an adverse employment action. Even if it does, however, Stevenson fails to proffer record evidence of the negative review. To the contrary, the record evidence shows that while Stevenson identified jobs with Spectrum and Comcast that he claims he was denied in retaliation for his EEOC charge, Stevenson testified that he never applied to either job at Spectrum or Comcast. Doc. 41-1 at 201–202. Moreover, there is no record evidence that any potential employer contacted Frontier about Plaintiff. Thus, in the absence of any evidence of post-termination adverse action,[9] Stevenson's claim under the FWA fails as a matter of law.

## IV.    CONCLUSION

The Court finds no unlawful sex discrimination. But even if Stevenson could establish a *prima facie* case, Frontier has provided a legitimate, nondiscriminatory reason for Stevenson's termination and Stevenson fails to show the reason given was a pretext for discrimination. The Court further finds no evidence of retaliation or violation of the FWA. As no genuine issues of material fact exist, Frontier is entitled

---

[9] Stevenson admits he did not make any complaint about discrimination or illegal action at Frontier until he submitted his EEOC charge of discrimination, which occurred *after* he was terminated.

to summary judgment in its favor on Stevenson's discrimination claims under Title VII, the Florida Civil Rights Act, and the City of Tampa's Human Rights Ordinance and on his retaliation claim under Florida's Whistle Blower Act. Accordingly, it is

**ORDERED AND ADJUDGED**:

1.     Defendant's Motion for Summary Judgment (Doc. 36) is **GRANTED**.

2.     The Clerk is directed to enter Judgment in favor of Defendant Frontier Florida, LLC, and against Plaintiff, Drashea Stevenson.

3.     The Clerk is further directed to terminate any pending motions and deadlines and **CLOSE** this case.

**DONE AND ORDERED** in Tampa, Florida on March 28, 2023.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any